**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| DUSTIN LEE HONKEN, : | |
| : | |
| Plaintiff, : | Case No. _____ |
| : | |
| v. : | *** **Capital Case** *** |
| : | |
| WILLIAM P. BARR, in his official capacity as : | |
| the Attorney General of the United States; : | |
| MICHAEL CARVAJAL, in his official capacity : | **Execution scheduled for** |
| as the Director of the Federal Bureau of Prisons; : | <u>**July 17, 2020**</u> |
| DONALD W. WASHINGTON, : | |
| in his official Capacity as the Director of the : | |
| United States Marshal Service; and : | |
| T.J. WATSON, in his official capacity as the : | |
| Complex Warden for the United States : | |
| Penitentiary, Terre Haute, : | |
| : | |
| Defendants : | |
| : | |

<u>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**</u>

Plaintiff Dustin Lee Honken, for his Complaint against Defendants, hereby alleges as follows:

**NATURE OF THE ACTION**

1.      Plaintiff Dustin Lee Honken brings this action seeking injunctive and declaratory relief, pursuant to 28 U.S.C. §§ 1331, 1343, 2201(a), and 2202, for (i) violation and threatened violation of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq*., and (ii) violation and threatened violation of the Free Exercise Clause of the First Amendment to the United States Constitution.

1

2.     Plaintiff Honken has been sentenced to death under federal law.  Defendants have scheduled Mr. Honken's execution for July 17, 2020.  Mr. Honken seeks to exercise his religion by having a Catholic priest with him in the execution chamber during the execution and by receiving the sacraments prescribed by the Catholic Church for the dying.  On June 23, 2020, Defendants refused Mr. Honken's request to have a spiritual adviser in his immediate presence during his execution.

## PARTIES

3.     Plaintiff Dustin Lee Honken is a United States citizen and a death-sentenced prisoner in the custody of Defendants and under the control and supervision of the Bureau of Prisons (BOP), which is an agency within the Department of Justice (DOJ).  He is incarcerated at the United States Penitentiary in Terre Haute, Indiana (USP Terre Haute), where Defendants have scheduled his execution for July 17, 2020.

4.     Defendant William P. Barr is the Attorney General of the United States. Plaintiff was remanded into the Attorney General's custody upon his conviction and death sentence. Attorney General Barr is the highest ranking official in the DOJ and has authority over the BOP. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

5.     Defendant Michael Carvajal is the Director of the BOP. As Director of the BOP, Defendant Carvajal is charged with directing executions and has substantial discretion in determining who may be present during an execution and under what conditions.  Defendant Carvajal is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

6. Defendant Donald W. Washington is the Director of the United States Marshal Service (USMS). Director Washington is charged with designating a United States Marshal to supervise federal executions at USP Terre Haute. He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

7. Defendant T.J. Watson is the Complex Warden of USP Terre Haute. In his position as complex warden, Defendant Watson is charged with management of USP Terre Haute and the oversight and implementation of operations there, including of executions at the prison. Defendant Watson exercises substantial discretion in determining who may be present during an execution and under what conditions. Defendant Watson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

8. Defendants are acting, and each of them at all relevant times were acting, in their official capacities with respect to all acts described herein, and were in each instance acting under the color and authority of federal law. Upon information and belief, unless preliminarily and permanently enjoined, each of the Defendants intends to act in his official capacity and under the authority of federal law in executing Plaintiff in violation of Plaintiff's constitutional and statutory rights.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because (i) it arises under the Constitution and the laws of the United States; (ii) it seeks to secure prospective, equitable relief directly under the First Amendment of the United States Constitution; (iii) one purpose of this action is to secure declaratory relief under 28 U.S.C. § 2201(a); (iv) one purpose of this action is to secure preliminary and permanent injunctive relief under 28 U.S.C.

§ 2202; and (v) one purpose of this action is to secure equitable relief under an act of Congress providing for the protection of civil rights as described in 28 U.S.C. § 1343.

10.     This Court has venue under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims made by Plaintiff — including his request to have a spiritual adviser in his immediate presence during his execution, the Defendants' denial of that request, and the execution itself — have taken place or will take place in this District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11.     On June 15, 2020, the Government scheduled Mr. Honken's execution for July 17, 2020.  On June 23, 2020, Mr. Honken made written request of both the BOP Staff (BP-8) and the Warden (BP-9) "to choose a Catholic priest or bishop to be in my immediate presence in the execution chamber before and during my execution. . . .  Please let me know if this will be approved and by when I should provide the name of my chosen priest or bishop."  These requests were denied on June 23, 2020.

12.     Mr. Honken has pursued an administrative appeal of this decision, most recently by submitting his BP-10 and BP-11 forms on June 30, 2020. Also on June 30, 2020, Mr. Honken timely designated Father Mark O'Keefe, OSB, of Terre Haute as the spiritual advisor he wishes to attend his execution and expressly requested that Fr. O'Keefe be permitted to accompany Mr. Honken in the execution chamber.

13.     As of the date of this filing, BOP has not yet ruled upon the administrative appeal.  The Defendants are not required to respond to the appeal until after the scheduled execution date of July 17, 2020, and no further administrative remedies are available. Accordingly, Mr. Honken has exhausted all available administrative remedies.

## FACTUAL BACKGROUND

14.     Mr. Honken has been a sincere, practicing Catholic for more than ten years.  He attends Catholic Mass and receives Communion regularly; he receives Catholic ministry regularly; and he believes sincerely in the Catholic faith.

15.     For at least the past ten years, Sister Betty Donoghue has been the minister of record for Mr. Honken.  Sister Donoghue ministers with the Ministry of Care at Saint Mary-of-the-Woods, with the Sisters of Providence in Terre Haute, Indiana, and she has ministered to Mr. Honken throughout this time, meeting with him regularly.  Mr. Honken also has met regularly with Catholic priests at USP Terre Haute and has been visited by the Archbishop.

16.      On June 23, 2020, Mr. Honken requested a Catholic priest or bishop to be in his immediate presence in the execution chamber before and during his execution.  On June 30, 2020, Mr. Honken designated Father Mark O'Keefe, a member of the Order of St. Benedict, as the spiritual advisor he wishes to attend his execution pursuant to 28 C.F.R. § 26.4(c)(3)(i), and requested that Fr. O'Keefe be permitted to accompany Mr. Honken in the execution chamber.  Fr. O'Keefe is an accredited volunteer at USP Terre Haute, and he has passed all security checks and received the necessary credentialing to allow him to minister to inmates on death row.

17.     Fr. O'Keefe was one of the Catholic priests who had ministered to Mr. Honken at USP Terre Haute, meeting with him one-on-one several times.  On one of those occasions, Mr. Honken told Fr. O'Keefe that he wished to have a priest accompany him in the execution chamber, to minister to him at the time of his death.  Mr. Honken sincerely believes that having a priest with him at the moment of death is essential to his religious practice, including his receipt of the Last Rites, the prescribed Catholic sacrament for the dying.  In so believing, Mr. Honken seeks to avail himself of longstanding American and Christian traditions of permitting clergy to accompany the

condemned during executions, in this case to receive the sacraments that enable him to avail himself of the redemption that the death of Jesus offers.

> **A.      Clergy Presence at Executions**
>
> > **1.      The Christian Tradition of Clergy Presence at Death.**

18.      In Christianity, the tradition of clergy presence at the time of death derives from Jesus Christ's execution and ministry to the men being crucified alongside him.  *See Luke* 23:42-43 (assuring the repentant criminal, "today you shall be with me in Paradise").  The belief that a person's dying moments are critical to salvation has long persisted.  *See*, *e.g.*, Ralph Houlbrooke, *Death, Religion, and the Family in England, 1480-1750* 147–49 (1998) ("The last moments of life were believed to be crucially important during the later Middle Ages. . . . [A]t this critical juncture, the Church offered help generally regarded as indispensable in making a safe departure from the world . . . .").

19.      The Catholic Church teaches that the final moments offer a unique final chance to prepare for "our heavenly homeland" and for pardon and redemption.  *See Catechism of the Catholic Church* §§ 1525; 1524 (concerning viaticum administered to those "at th[e] moment of 'passing over' to the Father"); 1501-1502 (effect of expected death on discernment); § 1013 (moment of death "decides [man's] ultimate destiny").  This tradition remains an important part of modern Catholicism: "The presence of a priest or deacon shows more clearly that the Christian dies in communion with the church," and is "intended to help the dying person, if still conscious, to face the natural human anxiety about death by imitating Christ in his patient suffering and

dying."  Liturgy Training Publications, *The Liturgy Documents Volume Two: Essential Documents for Parish Sacramental Rites and Other Liturgies* 228 (2nd ed. 2012).[1]

20.     As a Catholic, Mr. Honken believes and understands that it is essential that he receive Last Rites and the sacraments of the Eucharist and Confession up to his last breath, which requires that the priest minister at his side.  Consistent with teachings of the Catholic Church, Mr. Honken seeks the accompaniment and ministry of a priest, and seeks to receive the Last Rites, make his last confession, and recite a good act of contrition until the moment of death, as he understands is necessary for the possibility of the redemption offered by Jesus.  The current pandemic has provided stark reminders that this tradition remains a central part of modern religious life.  As a Jesuit chaplain said in explaining clergy efforts to see gravely ill COVID-19 patients, "The whole point of the sacrament is a reminder that we are not alone. . . . The church is present with this person, and God is present with this person."  Elizabeth Dias, *The Last Anointing*, N.Y. Times (June 6, 2020), https://www.nytimes.com/interactive/2020/06/06/ us/coronavirus-priests-last-rites.html.  Another priest said of the abiding importance of sacrament:  "The most significant moment, the defining moment of our life, is how we die."  *Id.*

## 2.     The American Tradition of Clergy Presence at Executions.

21.     Throughout American history, including when the First Amendment was adopted, clergy presence at the time and place of executions has been recognized as a fundamental interest of the condemned.  *See* Stuart Banner, *The Death Penalty: An American History* 1 (2002) (recounting execution where the condemned asked a clergyman to read his final words for him).

---

[1] *See also Pope encourages group working to end use of death penalty*, Cath. News Agency (Feb. 27, 2019), https://www.catholicnewsagency.com/news/pope-encourages-group-working-to-end-use-of-death-penalty-89197 (Pope stating that, in executions, "there should at the very least be clergy available to hear a person's confession and offer reconciliation, even up to the moment of death.").

At the nation's founding, a clergyman's "execution sermon" from the scaffold went hand-in-hand with "the formulaic lives, last words, and dying confessions of the prisoner[.]"  Louis P. Masur, *Rites of Execution: Capital Punishment and the Transformation of American Culture 1776-1865* 26 (1989).  This clerical role "was so routine that in 1791 William Smith could publish a guide-book for ministers [that contained] suitable devotions before, and at the time of Execution."  *Id.* at 18.[2]

22.     Federal executions have long followed this tradition.  The first known federal execution, the hanging of Thomas Bird in 1790,[3] incorporated "solemn religious exercises."  *See Portland*, Cumberland Gazette, June 28, 1790, at 3.  Mr. Bird's final statement closed with a prayer for divine forgiveness.  *The Dying Speech of Thomas Bird, executed at Portland, June 25, 1790, for the murder of Capt. John Connor, on board the Mary, near the coast of Africa, taken from his mouth on the last day of his life*, Cumberland Gazette, July 26, 1790 at 4.  As in other executions of the day, the condemned man's exercise of religion with and through clergy continued to the place and time of death.  *See May 10*, Vergennes Gazette & Vt. & N.Y. Advertiser, May 29, 1800, at 3 (reporting federal executions in which condemned prisoners were "attended to the place of execution" by clergymen, where they prayed and expressed contrition); *The Execution of Edward F. Douglass and Thomas Benson for the Murder of Ava A. Havens*, Bos. Herald, Jul. 28, 1851, at

---

[2] Unsurprisingly, these American traditions were similar to English practices during the colonial era. *See, e.g.*, Randall McGowen, *The Body and Punishment in Eighteenth-Century England*, 59 J. Mod. Hist. 651, 651 (1987) ("The condemned . . . were accompanied by a clergyman who shadowed their last moments urging them to repent or consoling them with the offer of divine forgiveness.").

[3] *See* "Historical Federal Executions," United States Marshals Service, *available at* https://www.usmarshals.gov/history/executions.htm (last checked July 3, 2020).

1 (reporting federal executions in which clergymen accompanied and embraced condemned prisoners on the gallows, and then conveyed their final declarations of innocence).

23.     The tradition of clergy accompaniment during federal executions has since been incorporated into firing squads, *see* R. Michael Wilson, *Legal Executions in the Western Territories, 1847-1911*, 173 (2010); the gas chamber, *see Arthur Brown Executed In Gas Chamber*, Streator Daily Times-Press, Feb. 24, 1965, at 1; and electrocutions, as when a rabbi accompanied Ethel and Julius Rosenberg to the electric chair in 1953, *see* Jack Woliston, *Rosenbergs go silently to electric chair*, UPI (June 20, 1953), https://www.upi.com/Archives/1953/06/20/Rosenbergs-go-silently-to-electric-chair/5084629411212/.[4]   Clergy accompaniment has likewise been permitted at USP Terre Haute.  *See* Ruby L. Bailey, *Killer dies a quiet death: Bomber's Punishment Paves Way for 20 others on Death Row*, Detroit Free Press, June 12, 2001, at 6A ("Once [McVeigh] was strapped down, a priest brought to the prison administered the Sacrament of the Anointing of the Sick, also called the last rites."); *McVeigh took last rites before execution*, CNN (June 12, 2001), https://www.cnn.com/2001/LAW/06/11/mcveigh.03/index.html ("Strapped to a gurney, awaiting the lethal injection . . . Timothy McVeigh asked to see a priest. . . .   The rites were performed before curtains were opened to allow witnesses to observe the execution.")

3.     ***Murphy v. Collier* and *Gutierrez v. Saenz***

24.     Recent orders from the United States Supreme Court confirm the significant legal interests that condemned prisoners have in being accompanied by clergy at their executions.

---

[4] *See also* Ari L. Goldman, *Rabbi Irving Koslowe, 80; Gave Rosenbergs Last Rites*, N.Y. Times, Dec. 8, 2000, at C15 (describing the same rabbi's attendance at 17 executions where "[h]e would go into the execution chamber, stand opposite as the inmate was strapped into the electric chair, and stay until the end").

25.    The State of Texas scheduled the execution of Patrick Henry Murphy, a Buddhist, for March 28, 2019.  At that time, Texas permitted condemned prisoners to have a State-employed chaplain (all of whom were Christian or Muslim) with them in the execution room at the time of their execution, but not any other spiritual adviser.  Mr. Murphy requested that his Buddhist minister be permitted to accompany him into the execution chamber, but Texas denied that request. Mr. Murphy filed suit, alleging that the refusal to permit a Buddhist spiritual adviser in the execution room violated his rights under the First Amendment and the Religions Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc-2000cc-5, which is the RFRA analogue that applies to state-funded prisons.

26.    On March 28, 2019, the United States Supreme Court stayed Mr. Murphy's execution.  *Murphy v. Collier*, 139 S. Ct. 1475, 1475 (2019).  Justice Kavanaugh expressed his view that the State could cure its "denominational discrimination" by either "(1) allow[ing] all inmates to have a religious adviser of their religion in the execution room; or (2) allow[ing] inmates to have a religious adviser, including any state-employed chaplain, only in the viewing room, not the execution room." *Id*. (Kavanaugh, J., concurring in grant of application for stay).  On April 2, 2019, Texas adopted Justice Kavanaugh's second suggestion and revised its policy to prohibit all religious and spiritual advisers from entering the execution chamber at the time of an execution.

27.    After the change in policy, another Texas prisoner, Ruben Gutierrez, filed suit alleging that the prohibition against the presence of Christian clergy in the execution chamber violated his rights under RLUIPA and the First Amendment.  On June 9, 2020, the district court stayed his execution, which had been set for June 16, 2020.  The Fifth Circuit vacated the stay, but on June 16, 2020, shortly before the scheduled execution, the Supreme Court stayed his execution and remanded to the district court to determine "whether serious security problems would result if

a prisoner facing execution is permitted to choose the spiritual adviser the prisoner wishes to have in his immediate presence during the execution." *Gutierrez v. Saenz*, No. 19A1052, --- S. Ct. ---, 2020 WL 3248349, at *1 (U.S. Jun. 26, 2020).

4.   **Clergy presence at Plaintiff's execution would not pose penological problems.**

28.   As demonstrated by the longstanding tradition of permitting clergy to be present with the condemned prisoners during federal executions, having clergy present in the execution room with Plaintiff would not raise serious practical or security problems.  Rather, clergy presence presents a feasible alternative to more restrictive measures, including Defendants' decision here to permit a spiritual adviser only to witness Plaintiff's execution from a separate room.  American executions have long included clergy, but few if any accounts suggest that clergy have ever disrupted the course or security of executions.  To the contrary, members of the clergy frequently facilitate the security, expediency, and solemnity of executions, including by providing spiritual and emotional guidance to the condemned prisoner.

B.   **Procedural History**

29.   In 2004, Plaintiff was convicted of five murders and related charges and was sentenced to death in the United States District Court for the Northern District of Iowa.  The District Court conducted formal sentencing on October 11, 2005.  *United States v. Honken*, N.D. Iowa Case No. 3:01-cr-3047.  Plaintiff's convictions and sentence were affirmed on direct appeal. *United States v. Honken*, 541 F.3d 1146 (8th Cir. 2008), cert. denied, 558 U.S. 1091 (2009).

30.   On December 13, 2010, Plaintiff filed a Motion for Relief Pursuant to 28 U.S.C. § 2255. *Honken v. United States*, N.D. Iowa Case No. 3:10-cv-3074, Doc. No. 1.  On October 4, 2013, the District Court granted the motion as to five non-capital convictions but otherwise denied the motion, and denied a certificate of appealability.  *Honken v. United States*, 42 F. Supp. 3d 937

(N.D. Iowa 2013).  The Eighth Circuit denied a motion for certificate of appealability on May 2, 2014, and the United States Supreme Court denied certiorari.  *Honken v. United States*, Case No. 14-1329, Doc. 4150218 (8th Cir. 2014), *cert. denied*, 136 S. Ct. 29 (2015).

31.     On July 25, 2019, DOJ announced that BOP had adopted a new execution protocol and at the same time, DOJ scheduled execution dates in December 2019 and January 2020 for five federal prisoners, including Mr. Honken.  Four of the prisoners, including Mr. Honken, intervened in ongoing litigation and sought preliminary injunctions against the use of the new protocol in their executions, alleging violations of the Administrative Procedure Act (APA), 5 U.S.C. §§ 500 *et seq*., the Federal Death Penalty Act (FDPA), 18 U.S.C. §§ 3591-3598, and the United States Constitution.

32.     The District Court preliminarily enjoined the Government from conducting the executions under the Protocol, concluding that the FDPA requires the Government to follow execution procedures mandated by state law.  *In re Fed. Bureau of Prisons' Execution Protocol Cases*, No. 1:19-mc-145, 2019 WL 6691814 (D.D.C. Nov. 20, 2019).  A divided panel of the D.C. Circuit vacated the injunction in an opinion issued on April 7, 2020, finding both that the protocol did not violate the FDPA, and that the Government had not violated the APA by adopting the protocol without public notice and comment.  *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106 (D.C. Cir. 2020).  After expedited proceedings, the Supreme Court denied certiorari on June 29, 2020.

## COUNT I
### (Violation of RFRA)

33.     Plaintiff realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 32.

34.     The RFRA establishes "very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014).   The RFRA "prohibits the Federal Government from taking any action that substantially burdens the exercise of religion unless that action constitutes the least restrictive means of serving a compelling government interest." *Id.* at 690-91; *see* 42 U.S.C. §§ 2000bb–1(a), (b).  As amended, RFRA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc–5(7)(A).

35.     Catholicism, as understood and practiced by Plaintiff and as taught by the Catholic Church, recognizes the importance and incorporates the practice of having clergy present at the time and place of death, including at executions.  Plaintiff is a devout Catholic and sincerely wishes to have clergy present with him at his execution pursuant to his Catholic beliefs and practice, and in order to seek the redemption offered by Jesus.

36.     From the very beginnings of Christianity until now, the presence of clergy *with* a dying person has been considered essential, particularly in Catholicism, and from its inception the United States has permitted clergy to be present with the condemned—praying, ministering, and listening—up until the moment of death.  Prohibiting Plaintiff from being accompanied, guided, and assisted at the time and place of his death by a priest would be an explicit and substantial burden on religious exercise in violation of the RFRA.  Defendants here will substantially burden Plaintiff's exercise of religion by prohibiting a priest from being immediately present with Plaintiff in the execution chamber during his execution.

37.     Defendants lack a compelling interest in prohibiting a priest from being present in the execution chamber.   Alternatively, even if Defendants have such a compelling interest, feasible, less restrictive alternatives would adequately serve that interest, including by abiding the tradition of permitting clergy presence in the execution chamber, and by addressing any security or practical concerns through background checks of clergy, binding agreements with clergy, and/or training of clergy.   Fr. O'Keefe is an accredited volunteer at USP Terre Haute, and he has passed all security checks and received the necessary credentialing to minister to inmates on death row. Moreover, to the extent that Defendants' denial of Mr. Honken's request is informed by concerns about the spread of the COVID-19 virus in the execution room, these concerns could readily be addressed in a less restrictive manner that would protect Mr. Honken's fundamental religious right to the presence of a priest at his side during his execution, namely, by postponing the execution until the presence of Father O'Keefe poses no risk of virus transmission.

38.     Defendants are violating and will violate RFRA unless Plaintiff is permitted to have a priest in his immediate presence in the execution chamber during the execution.

## COUNT II
### (Violation of the Free Exercise of Religion under the First Amendment)

39.     Plaintiff realleges and incorporates by reference the allegations set forth above in paragraphs 1 through 38.

40.     The First Amendment commands that "Congress shall make no law . . . prohibiting the free exercise of" religion.  U.S. Const. amend. I.  The Free Exercise Clause reflects that "the people of this nation have ordained in the light of history," that "[religious] liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." *Cantwell v. State of Connecticut*, 310 U.S. 296, 310 (1940).  The Government may accordingly restrict religious conduct only when "subject to regulation for the protection of

14

society." *Id*. at 304.  The Government violates the Free Exercise Clause where, absent a sufficient countervailing interest, a person holds a sincere religious belief and the State substantially burdens his ability to practice his religion.  *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981).

41.     Because clergy's role in executions "was well established and undoubtedly well known, it seems equally clear that the state legislatures that ratified the First Amendment had the same understanding."  *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 603 (2014) (Alito, J., concurring).  This practice is deeply embedded in American religious and legal tradition, and Defendants lack sufficient justification to prohibit it here.  Defendants' refusal to permit clergy in the execution chamber during Plaintiff's execution will substantially burden the free exercise of his Catholic faith, in violation of the Free Exercise Clause.

42.     Even if the standard set forth in *Turner v. Safley*, 482 U.S. 78, 89 (1987), were to govern here (and Plaintiff contends that it does not), Defendants' conduct still violates the Free Exercise Clause.  *Turner* established a four-factor test for determining whether a burden on a prisoner's religious rights is justified by countervailing State interests: 1) whether there is a valid, rational connection between the prison policy and a legitimate governmental interest; 2) whether the prisoner has "another avenue" to exercise the right; 3) whether accommodating the right will have a significant "ripple effect" on prison staff or resources; and 4) whether there is a ready alternative that fully accommodates the prisoner's rights.  482 U.S. at 89-91.

43.     Defendants lack a legitimate penological objective for this prohibition and have failed to adopt available alternative measures that would adequately serve any legitimate objective that they do have.  The religious practice at issue here is specific to clergy accompaniment at the time and place of death; it is deeply embedded in American history; and it is being completely

denied to Plaintiff.   If a priest is seated among spectators in another room, Plaintiff will not be able to converse or pray with the priest, nor be ministered by him in accordance with Plaintiff's Catholic faith, including the receipt of Last Rites and the sacraments of Eucharist and Confession at the time of death.  Plaintiff therefore cannot exercise this right by any "other avenue."  *Id.* at 90. Clergy in the execution room pose no greater dangers, risks, or expenses now than they did during the long history during which they were permitted at the side of the condemned.  Fr. O'Keefe is an accredited volunteer at USP Terre Haute, and he has passed all security checks and received the necessary credentialing to minister to inmates on death row.  The longstanding tradition therefore provides an "obvious, easy alternative[]" to accommodate Plaintiff's religious right, and returning to the traditional policy will not have a "a significant ripple effect" on prison guards or resources. *See id*.

44.     Temporary concerns about the spread of the COVID-19 virus also fail to provide a valid penological basis to deny Mr. Honken his fundamental religious right to the presence of a priest at his side during his execution.  To be sure, the COVID-19 virus is highly contagious, particularly in a prison setting, and Defendants' insistence on proceeding with the execution of Defendant and several other death row inmates in the midst of the pandemic may risk additional spread of the virus to a vulnerable population.  However, to the extent these concerns inform Defendants' denial of Mr. Honken's request, they still cannot provide a valid basis for sacrificing Mr. Honken's religious rights in the most essential moment of his death, especially where an alternative—postponement of the execution until the presence of Father O'Keefe poses no risk of virus transmission—readily exists.

45.     Defendants are violating and will violate the Free Exercise Clause unless Plaintiff is permitted to have a priest in his immediate presence in the execution chamber during the execution.

## PRAYER FOR RELIEF

WHEREFORE, to prevent the violations of the First Amendment of the United States Constitution and the RFRA as alleged above, Plaintiff requests that the Court enter a judgment:

1.      declaring that the Defendants' actions and decisions with regard to prohibiting a member of the clergy to be in Plaintiff's immediate presence in the execution chamber during Plaintiff's execution are illegal and violate the RFRA and First Amendment;

2.      enjoining Defendants and all persons acting on their behalf from executing Plaintiff without permitting him to choose a member of the clergy to be in Plaintiff's immediate presence in the execution chamber before and during his execution; and

3.      granting such further relief as the Court deems just and proper.

Dated:   July 3, 2020                    Respectfully Submitted,

**PLAINTIFF DUSTIN LEE HONKEN**

By:     */s/  Abigail A. Clapp*

Abigail A. Clapp (Ind. Atty. No. 25444-45)
Greenberg Traurig, LLP
77 W. Wacker Dr., Ste. 3100
Chicago, IL   60601
Tel.    (312) 456-8400
Fax     (312) 899-0393
Email   ClappA@gtlaw.com

Edward C. Wallace*
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166
Tel:  (212) 801-9200
WallaceE@gtlaw.com

Michael M. Krauss*
Greenberg Traurig, LLP
90 South Seventh Street, Suite 3500
Minneapolis, MN  55402
Tel:  (612) 259-9700
KraussM@gtlaw.com

Kyle R. Freeny*
Greenberg Traurig, LLP
2101 L Street, N.W., Suite 1000
Washington, DC  20037
Tel:  (202) 331-3100
FreenyK@gtlaw.com

*pro hac vice* motion forthcoming